# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE


Fraser Engineering Company, Inc.

     v.                                  Case No. 17-cv-102-JD
                                           Opinion No. 2018 DNH 067

IPS-Integrated Project Services, LLC
and Lonza Biologics, Inc.


## O R D E R

Fraser Engineering Company, Inc., alleges that IPS-Integrated Project Services, LLC, and Lonza Biologics, Inc., wrongfully withheld payments for subcontract work Fraser performed on a construction project. IPS served as general contractor on the project, which involved the design and construction of a building in Portsmouth, New Hampshire. Lonza owned the building. Fraser entered into a subcontract with IPS to provide mechanical and plumbing services as part of the project.

The sole issue before the court is whether Fraser may perfect a mechanics lien on the property.[1] Fraser moved for, and was granted, an ex parte attachment in state court. The

---

[1] Arbitration will resolve the merits of the parties' dispute. See Jan. 11, 2018 Order (doc. no. 40) at 8-9 (DiClerico, J.) (ordering the parties to proceed to arbitration).

defendants objected to that attachment before removing the case to this court. They then filed an assented-to motion for a hearing on their objections pursuant to N.H. Rev. Stat. Ann. (RSA) § 511-A:3. The district judge granted that motion and directed Fraser to refile its complaint and its motion for ex parte attachment and the defendants to refile their objections to that motion. Mar. 22, 2017 Order (doc. no. 8) at 2-3 (DiClerico, J.). The district judge designated the undersigned magistrate judge, pursuant to 28 U.S.C. § 636(b)(1)(A), to consider and resolve the defendants' objections.[2]

The court held a hearing on the objections in May 2017. At that time, the court granted the parties leave to file post-hearing memoranda and statements of fact. Following the hearing, Fraser moved to compel the defendants to produce the prime contract governing the project. The defendants objected, and the district judge referred the motion to the undersigned.

---

[2] The undersigned indicated in a previous order that the mechanics lien issue had been referred for report and recommendation. In doing so, the undersigned misconstrued under which subsection of 28 U.S.C. § 636 the district judge designated this matter for review. Section 636(b)(1)(A) allows a district judge, with certain exceptions not presently applicable, to "designate a magistrate judge to hear and determine any pretrial matter pending before the court . . . ." The undersigned may therefore resolve the present matter by way of written order. See, e.g., Osgood v. Kent, No. 11-cv-477-SM, 2011 WL 6740411, at *1 (D.N.H. Dec. 21, 2011) (magistrate judge resolved mechanics lien issue via order); H.E. Contracting v. Franklin Pierce Coll., 360 F. Supp. 2d 289, 290 (D.N.H. 2005) (same).

The court initially deferred ruling on the motion to compel based on the parties' representation that they would mediate this matter in November 2017. When that mediation did not occur, however, the court conducted an in camera review of the prime contract and granted the motion to compel in part. Following that ruling, the parties submitted a statement of undisputed facts, statements of disputed facts, post-hearing memoranda, and replies. The mechanics lien issue is therefore ripe for resolution.

Having reviewed the parties' pre- and post-hearing filings and their arguments at the hearing, the court overrules the defendants' objections to Fraser's attachment. As discussed below, the defendants have not demonstrated that Fraser failed to timely perfect the lien, that Fraser waived the lien, or that the lien amount should be reduced. Fraser is accordingly entitled to a mechanics lien on the property in the amount of $4,917,122.02.

## I.    Standard of Review

Absent an applicable federal statute, "the law of the state where the [district] court is located" governs attachment proceedings. Fed. R. Civ. P. 64(a), (b). Under New Hampshire law, any person who performs labor or furnishes materials in the amount of $15 or more when erecting or repairing a building

pursuant to a contract with the owner of that building has a lien on the materials furnished and on the building.  See RSA 447:2, I.  RSA 447:5 extends that right to subcontractors performing work or furnishing materials pursuant to a subcontract, so long as certain notice requirements are met. The lien continues for 120 days after the work is performed or the materials are furnished, unless payment is made.  See RSA 447:9.  The lien may be secured beyond the 120-day period by attaching the subject property during the lien period.  RSA 447:10.

RSA 511-A, which governs pre-judgment attachment procedures, applies to proceedings to secure mechanics liens under RSA 447.  See Chagnon Lumber Co. v. Stone Mill Const. Corp., 124 N.H. 820, 823 (1984).  Under RSA 511-A:8, a court may attach property ex parte if a plaintiff establishes probable cause of its basic right to recovery and the amount of the lien. RSA 511-A:8, III; Chagnon, 124 N.H. at 823.  When a court grants an ex parte attachment, the party against which the attachment is made may object and is entitled to a prompt hearing.  RSA 511-A:8.

Though a burden-shifting framework typically applies during attachment hearings, see RSA 511-A:3, several courts, including at least two in this district, have declined to follow this framework when analyzing mechanics liens, see Osgood v. Kent,

4

No. 11-cv-477-SM, 2011 WL 6740411, at *3 (D.N.H. Dec. 21, 2011);

H.E. Contracting v. Franklin Pierce Coll., 360 F. Supp. 2d 289,

291 (D.N.H. 2005); W. Side Dev. Grp. v. D'Amour, No. 04-C-018

(N.H. Super. Mar. 24, 2004); Consolidated Elec. Distrib., Inc.

v. SES Concord, Co., No. 89-C-571/579 (N.H. Super. Nov. 21,

1989).  Those courts instead analyze whether a plaintiff has met

its burden under RSA 511-A:8, which a defendant may rebut by

challenging the plaintiff's basic right to recovery, the lien

amount, or the notice provisions.  See Osgood, 2011 WL 6740411,

at *3; H.E. Contracting, 360 F. Supp. 2d at 291.  Both parties

agreed at the hearing that the RSA 511-A:3 framework does not

apply in the present context.  See Hearing Trans. (doc. no. 29)

at 71-74.  Accordingly, the court will analyze this matter under

the standard articulated by those courts that have found RSA

511-A:3 inapplicable.


## II.  Background[3]

Lonza leases a building on property in Portsmouth, New

Hampshire.  Doc. no. 43 ¶ 1.  On September 8, 2014, Lonza and

IPS entered into an agreement for the design, procurement, and

construction of a manufacturing facility on that property.  Id.

¶ 2.  That agreement was subsequently amended on July 19, 2016.

---

[3] The following background is derived from the parties'
statement of undisputed facts and the evidence in the record.

Id.[4]  Pursuant to these documents, Lonza was required to pay IPS

for "the cost of trade labor including the indirect costs,

overhead and profit for all [s]ubcontractors and equipment

necessary for construction."  See Prime Contract § 17.16

On October 9, 2015, IPS notified Fraser that it intended to

award Fraser a subcontract to perform mechanical piping and

plumbing work on the project.  Doc. no. 43 ¶ 5.  Fraser and IPS

executed a formal subcontract on February 11, 2016, whereby

Fraser agreed to furnish all labor, services, materials, tools,

equipment, supplies, and any other items necessary or incidental

to perform the plumbing and mechanical scope of work on the

project.  Id. ¶¶ 3, 6.  The original subcontract sum was

$5,312,100.  Id. ¶ 7.

The subcontract contained specific procedures for

performing extra work.  See, e.g., doc. no. 12-1 at 5, 71.

Though Fraser did not always follow those procedures, IPS

approved change orders totaling $1,535,350.87.  See doc. nos.

12-2, 12-3.  IPS rejected four change orders totaling

$317,461.17.  See doc. no. 12 ¶ 12; doc. no. 12-5.

In December 2015, Fraser and IPS began having discussions

about Fraser potentially accelerating its work on the project.

---

[4] The court will refer to the September 8, 2014 agreement
and the July 19, 2016 amendment collectively the prime contract
unless it is necessary to distinguish between them.

Doc. no. 20-4.  On December 11, 2015, Fraser indicated to IPS
and Lonza that doing so would result in labor inefficiencies.
Doc. no. 20-5.  On December 21, 2015, IPS directed Fraser to
accelerate its work by using extra overtime under the
subcontract.  Doc. no. 20-7.  The accelerated work continued for
months, during which time the parties communicated on numerous
occasions about purported labor inefficiencies resulting from
the acceleration.  See doc. nos. 20-8 through 20-14.  The
inefficiencies directly resulted in Fraser's employees working
59,845 additional man-hours on the project.  Doc. no. 12-6 at 7,
29.

     The subcontract required Fraser to tag valves and mark
pipes.  Doc. no. 43 ¶ 12; doc. no. 12-1 at 32.  Fraser started
this work on August 9, 2016.  Doc. no. 20-16 at 11.  The work
continued through at least October 3, 2016.  See id. at 11-13;
doc. no. 20-17 at 4-7; doc. no. 20-18 at 1.  All told, Fraser
employees spent 1,199 hours tagging valves and marking pipes in
August, September, and October 2016.  See doc. no. 20-16 at 11-
13; doc. no. 20-17 at 4-7; doc. no. 20-18 at 1.

     The subcontract contained several additional clauses
relevant to the present dispute.  Under section 10.6, IPS has
the sole and exclusive option to arbitrate any disputes arising
under the subcontract, which it has invoked in this case.  Doc.
no. 12-1 at 13.  Section 4.18 contains what the defendants

characterize as a waiver of indirect damages. Doc. no. 12-1 at 8. Section 2.17 required Fraser to notify IPS of any unforeseen conditions resulting in changes to the work, and indicated that failure to do so would result in Fraser waiving any claim for an adjustment of time of completion, milestone dates, or agreement value. Id. at 4-6. Section 2.6 required IPS to submit conditional lien waivers with each request or invoice for a progress payment. Id. at 3, 79. During the course of its time on the project, Fraser submitted eight individual lien waivers pursuant to section 2.6. Fraser did not exclude any claims from the first seven of these waivers, the last of which was executed on May 31, 2016. See doc. no. 14-5. The eighth waiver, executed October 26, 2016, included exclusions. See doc. no. 45 ¶ 29.

On August 31, 2016, Fraser submitted a closeout claim to IPS in the amount of $4,006,505.72. Doc. no. 43 ¶ 10; doc. no. 12-6. Fraser specifically sought $3,324,083.30 for unpaid man-hours caused by the labor inefficiency (doc. no. 12-6 at 7, 29) and $682,422.42 resulting from changes in the scope of Fraser's work during the course of the project (doc. no. 12-6 at 2, 4, 7). See also doc. no. 43 ¶ 10. Fraser further indicated in its closeout claim that it was entitled to $1,554,867.29 in retainage and unpaid contract balance amounts. Doc. no. 12-6 at 2. On September 16, 2016, IPS rejected the closeout claim.

8

Doc. no. 43 ¶ 11.

On January 24, 2017, Fraser provided IPS and Lonza with a notice of intent to lien. See doc. no. 12-7. Two days later, Fraser filed a verified motion for ex parte attachment to perfect a mechanics lien in Rockingham County Superior Court. See doc. no. 1-1 at 12-18. Fraser specifically sought a lien totaling $4,917,122.02, including $3,324,083.30 in unpaid man-hours resulting from the labor inefficiency, $682,422.42 caused changes to the scope of Fraser's work, $593,155.13 in outstanding subcontract balance, and $317,461.17 in outstanding change order requests. Id. at 12. The state court granted Fraser's motion on an ex parte basis to the extent it sought to attach the building, fixtures, and leasehold held by Lonza. Id. at 19. After appearing and objecting to the attachment in state court, the defendants removed the matter here. See doc. no. 1.

### III. Discussion

By virtue of having received an ex parte attachment in state court, Fraser has met its initial burden under RSA 511-A:8. See id. (requiring that a plaintiff "establish[] probable cause to the satisfaction of the court of [its] basic right to recovery and the amount thereof" in order to receive an ex parte attachment). Thus, the burden shifts to the defendants to challenge Fraser's basic right to recovery, the lien amount,

and/or the notice provisions.  See Osgood, 2011 WL 6740411, at

*3; H.E. Contracting, 360 F. Supp. 2d at 291.  In objecting to

the lien, the defendants contend (1) that Fraser did not timely

perfect the lien; (2) that Fraser waived its right to the lien;

and (3) that the lien amount must be reduced.  The court

considers each argument in turn.

## A.  **Failure to Timely Perfect**

The defendants contend that Fraser did not perfect the

mechanics lien within 120 days, as required by RSA 447:9 and RSA

447:10.  Though the defendants concede that Fraser last

performed work on the project within the 120-day period, they

argue that any work performed after September 16, 2016 — 132

days before Fraser sought to perfect the lien — was "remedial

punch list work and other inconsequential work."  Doc. no. 44 at

20.  Relying on Bader Co. v. Concord Elec. Co., 109 N.H. 487

(1969), the defendants contend that this work cannot extend

Fraser's lien.

In response, Fraser argues that it performed work required

by its subcontract with IPS — namely, tagging valves and marking

pipes — less than 120 days before it sought to secure the

mechanics lien.  In Fraser's view, work expressly required by a

subcontract must count toward the 120-day calculation.  Fraser

further contends that the facts in Bader bear little resemblance

to those in this case.

Neither side is entirely correct.  On the one hand, the
defendants overstate the holding in Bader.  In that case, the
New Hampshire Supreme Court ruled that certain work "could be
found not to . . . extend the duration of the plaintiff's lien"
and that the trial court therefore "could properly find and rule
that [the plaintiff] did not have a mechanic's lien . . . ."
Id. at 489 (emphasis added) (citations omitted).  This language,
plainly conditional, does not constitute a broad holding.
Indeed, it does not even suggest that the trial court's ruling
was the only acceptable outcome.  Rather, the court in Bader
merely concluded that the trial court did not err in ruling for
the defendant based on the evidence before it.  Bader's
precedential value is accordingly limited.

And in any event, the court agrees with Fraser that Bader
is factually distinguishable.  Whereas the plaintiff in Bader
returned to the jobsite nearly a month after completing the
subcontract to perform certain remedial work, the record here
suggests that Fraser remained on the property continuously
through at least October 3, 2016.  See doc. no. 20-17; doc. no.
20-18.  Similarly, while the Bader court accepted the trial
court's finding the work at issue "was not done pursuant to the
contract," id. at 488-89, there is no dispute here that the
subcontract expressly required Fraser to tag valves and mark
pipes, see doc. no. 12-1 at 32 ("Perform all tagging and

labelling as indicated per the contract drawings and specifications."); doc. no. 43 ¶ 12. These factual differences further limit Bader's applicability to the present circumstances.[5]

At the same time, however, Fraser's contention that work performed pursuant to a subcontract must count toward the 120-day calculation appears to be at odds with precedent. In Peabody v. Wentzell, 123 N.H. 416 (1983), the New Hampshire Supreme Court declined to reach whether the plaintiff's work was inconsequential, gratuitous, or remedial "because there was sufficient evidence to support the . . . finding that the work at issue was not included in the parties' contract." Id. at 419. Though arguably dicta, this language suggests that work performed pursuant to a contract, but nonetheless inconsequential, gratuitous, or remedial, may not extend a mechanics lien period. As the New Hampshire Supreme Court has neither disavowed nor elaborated upon this language,[6] this court

_____

[5] The defendants' reliance on Fabcon Precast, LLC v. Zirkelbach Constr. Inc., No. 218-2015-cv-1101 (N.H. Super. Nov. 25, 2015), is misplaced for essentially the same reasons. In Fabcon, the court concluded that caulking work performed by the plaintiff did not extend the lien period because it was not performed as part of the final contract. Id. at 5. There is no similar evidence in the record here.

[6] Indeed, there appears to be only one other New Hampshire Supreme Court case that even addresses what types of work qualify to extend a mechanics lien. See Tolles-Bickford Lumber Co. v. Tilton Sch., 98 N.H. 55 (1953). But that case is

is disinclined to hold as a matter of law that work done pursuant to a contract <u>necessarily</u> extends a mechanics lien.

For its part, the mechanics lien statute provides little guidance.  For one, any strict construction of that statute in Fraser's favor would seemingly be at odds with <u>Peabody</u>.  More fundamentally, however, RSA 447 provides no definition of what sort of work creates a lien thereunder, and in fact uses multiple terms interchangeably to refer to that work.  <u>Compare</u> RSA 447:2, :5 ("labor") <u>with</u> RSA 447:9 ("services").  As such, the court is left without any concrete standard for determining what types work performed pursuant to a contract might nonetheless fail to extend a mechanics lien period.

Even so, the court is not without recourse.  The New Hampshire Supreme Court has noted, as recently as 2010, that "the purpose of the mechanics' lien law is remedial."  <u>Alex Builders & Sons, Inc. v. Danley</u>, 161 N.H. 19, 24 (2010) (citation omitted).  "The general rule is to construe remedial statutes liberally in favor of the person the statute is designed to benefit."  <u>Id.</u>  Here, Fraser has presented evidence that its employees tagged valves and marked pipes for 1,199 hours over a nearly two-month period, concluding less than 120

---

unhelpful here, both because, like <u>Bader</u>, it addressed work performed after the underlying contract was completed and because it concerned allegedly gratuitous work.  <u>See</u> <u>id.</u> at 58 (citation omitted).

days before the date Fraser sought to perfect its lien.  See

doc. no. 20-16 at 11-13; doc. no. 20-17 at 4-7; doc. no. 20-18

at 1.  Additionally, there is no dispute that the subcontract

expressly required valve tagging and pipe marking.  See doc. no.

12-1 at 32; Hearing Tr. (doc. no. 30) at 91.  Given the remedial

nature of the mechanics lien statute, and the absence of any

authority compelling a different outcome, the court cannot

conclude that this work was so de minimis that it did not extend

Fraser's lien.  The court therefore overrules the defendants'

objections insofar as they contend that Fraser failed to timely

perfect the mechanics lien.

**B.   Waiver**

The defendants further four arguments with respect to

waiver: (1) that the arbitration clause in the subcontract

constituted a waiver of the lien; (2) that Fraser waived the

lien by waiving indirect damages in the subcontract; (3) that

Fraser waived the lien by executing lien waivers throughout the

course of its work on the project; and (4) that Fraser waived

the lien by failing to give the defendants notice of its

inefficiency claim prior to performing the work.[7]  The court

---

[7] IPS also argues in its reply to Fraser's post-hearing
memorandum that the prime contract contains an explicit lien
waiver and that the subcontract incorporated the prime contract
through a "flow-down" provision.  As IPS does not explain its
delay in raising this argument, and Fraser has not had the

considers these arguments in succession.

1.    Arbitration Clause

The defendants contend that the arbitration clause in the subcontract constitutes a waiver of Fraser's mechanics lien claim.  They cite Pine Gravel, Inc. v. Cianchette, 128 N.H. 460 (1986), in support of this request.  The court need not linger on this argument, as Pine Gravel in fact holds the opposite. See id. at 465 ("[An] arbitration provision is not a waiver of the . . . right to a [mechanics] lien.").  The court accordingly overrules the defendants' objections insofar as they contend the arbitration clause waived the lien.[8]

2.    Waiver of Indirect Damages

Next, the defendants point to section 4.18, which they contend precludes Fraser from recovering indirect damages from IPS.  The defendants argue that this section constitutes a valid

_____

opportunity to respond, the court declines to address it.  See Pukt v. Nexgrill Industries, Inc., 2016 DNH 085, 12 n.2 (DiClerico, J.) (citations omitted) ("Ordinarily, the court does not consider arguments raised for the first time in a reply."); cf. United States v. Casey, 825 F.3d 1, 12 (1st Cir. 2016) ("[A]rguments raised for the first time in an appellate reply brief [are] ordinarily deemed waived . . . .").

[8] To the extent the defendants believe Pine Gravel mandates the dismissal of Fraser's underlying action, then this request is beyond the scope of the present review.  See Mar. 22, 2017 Order (doc. no. 8) (designating the undersigned to resolve "the defendants' objections to the plaintiff's attachment").  The court notes, however, that Judge DiClerico has already indicated that "[o]nce the motion for an attachment is resolved, the case will be closed."  Jan. 11, 2018 Order (doc. no. 40) at 9.

waiver of the mechanics lien.

The court disagrees. It is well-established under New Hampshire law that in order to waive the right to a mechanics lien by contract, "a clear expression of intent to waive the right must exist." Daniel v. Hawkeye Funding, Ltd. P'ship, 150 N.H. 581, 584 (2004) (quoting Pine Gravel, 128 N.H. at 465). Unlike in Daniel, where the contract in question had a provision titled "No Liens" and expressly waived "any Lien on the Facility Site, the Facility, or any part or interest in either," id. at 582, section 4.18 does not mention liens at all, see doc. no. 12-1 at 7. The court accordingly declines to discharge the lien pursuant to section 4.18.[9]

3. Subsequent Lien Waivers

The defendants next contend that Fraser executed a series of eight explicit lien waivers during the course of its work on the project. The defendants contend that Fraser did not exclude any of its claims from the first seven of these waivers, the last of which was executed May 31, 2016. See doc. no. 14-5.

_____

[9] The defendants appear to alternatively argue that even if section 4.18 did not constitute a lien waiver, it did waive Fraser's right to recover much of the lien amount. In response, Fraser contends that the amounts it seeks to recover are not consequential or indirect damages, but rather actual costs arising from labor and materials related to the project. These arguments, which go to the heart of the underlying dispute, are beyond the scope of the present analysis.

The defendants concede that the eighth waiver, executed October
26, 2016, included exclusions.  <u>See</u> doc. no. 45 ¶ 29.  The
defendants contend that in executing these waivers, Fraser
waived some, if not all, of its lien.

Fraser does not dispute that it signed the waivers in
question.  But according to Fraser, the waivers are not
enforceable because IPS knew they were not accurate at the time
they were signed.  To this end, Fraser contends that it
repeatedly communicated with the defendants between December 11,
2015, and August 31, 2016, regarding labor inefficiencies
stemming from IPS accelerating Fraser's work on the project.
<u>See</u> doc. nos. 20-4 through 20-14.  Fraser cites <u>Metro. Pier &
Exhibition Auth. ex rel. Pitt-Des Moines, Inc. v. Mc3D, Inc.</u>, 56
F. Supp. 2d 984, 988 (N.D. Ill. 1999), for the proposition that
a party cannot rely on an explicit lien waiver when it knew the
waiver did not accurately reflect the current subcontract price
and payment status.

Though both sides' arguments have their relative merits,
the court ultimately declines to discharge the lien on the basis
of these waivers.  The court reaches this determination for two
reasons.  First, there can be no reasonable dispute, based on
the evidence in the record, that the defendants were aware that
Fraser would seek compensation for labor inefficiencies at the
time many of the waivers were signed.  Though <u>Metro. Pier</u> does

not control the present analysis, the defendants have not cited,
and the court cannot identify, any New Hampshire Supreme Court
decision rejecting the proposition in that case. Given the
remedial nature of the mechanics lien law, the court is unable
to say with certainty that the New Hampshire Supreme Court would
ignore the defendants' awareness of the labor inefficiencies and
strictly enforce the lien waivers. Thus, the court declines to
hold as a matter of law that the defendants' awareness is
irrelevant.[10]

Even assuming the waivers are enforceable, however, the
court is unable to determine from the present record the extent
to which this affects Fraser's lien. The defendants do not
dispute that the last waiver under which Fraser did not reserve
its rights was executed May 21, 2016. Yet they have made no

---

[10] Typically, when presented with an issue of New Hampshire
law that the New Hampshire Supreme Court has not yet confronted,
this court "must make an informed prophecy of what that court
would do in the same situation." Galvin v. EMC Mortg. Corp., 27
F. Supp. 3d 224, 227 (D.N.H. 2014) (brackets, internal quotation
marks, and citations omitted). Prudence cautions against doing
so here. The waivers at issue do not merely release lien
rights, but also "all claims, demands, or causes of
action . . . which [Fraser] has, or might under any present or
future law, assert against [IPS] or [Lonza] relating to the
Partial Payment and/or the labor services, materials or
equipment for which the partial payment has been made." Doc.
no. 14-5 at 1. In other words, the enforceability of these
waivers goes directly to the merits of the underlying dispute.
That dispute is not before this court; it is left for the
arbitrator to decide.

attempt to separate the unpaid work Fraser performed before that date from the unpaid work Fraser performed thereafter. As there is no dispute that Fraser performed the work in question, this failure leaves the court with an insufficient record to reduce the lien by those amounts for which payment became due on or before May 21, 2016. See Guyotte v. O'Neill, 157 N.H. 616, 620-621 (2008) (noting that lien waivers do not extend to amounts due and owing after their execution).

The court accordingly overrules the defendants' objections to the extent they rely on the lien waivers Fraser executed during the course of its performance on the project.

### 4. Notice of Inefficiency Claim

Finally, the defendants argue that Fraser waived its right to include its inefficiency claim in the lien because it did not give the defendants notice of that claim before performing the work. In support of this argument, the defendants point to section 2.17 of the subcontract, which states in pertinent part that "[Fraser] shall notify [IPS] immediately of any unforeseen conditions that will result in changes to work. Failure [to do so] shall result in waiver by [Fraser] of a claim for any adjustment to time of completion, milestone dates, or agreement value, related to the impacts." Doc. no. 12-1 at 4-5 (capitalization omitted). In response, Fraser notes that section 2.17 does not explicitly waive liens and contends that,

in any event, Fraser provided the defendants with notice of its labor inefficiency claim before IPS directed Fraser to accelerate its work.

Fraser has the better argument at this juncture. Section 2.17 neither mentions liens nor uses language supporting the inference that it was designed to extend to liens. It is therefore not a clear expression of Fraser's intent to waive its lien rights. See Daniel, 150 N.H. at 584. Moreover, Fraser has provided evidence that it first informed the defendants on December 11, 2015, that accelerating its work on the project would result in labor inefficiencies, but that IPS nevertheless ordered Fraser to accelerate. See doc. nos. 20-5; 20-7. While the arbitrator will ultimately determine the legal significance of these facts, they are sufficient for now to sustain Fraser's lien claim. The court therefore declines to discharge or reduce the lien based on the language in section 2.17.

## C.  <u>Lien Amount</u>

Finally, the defendants contend that the mechanics lien amount should be reduced. They raise a series of arguments to this end: (1) that Fraser overstated its claim to include disputed amounts; (2) that the lien is limited by law to the amount Lonza owed IPS at the time of Fraser's notice of lien; and (3) that Fraser's claim prematurely includes unpaid retainage. Additionally, Lonza argues that the lien amount must

be reduced based on the New Hampshire Supreme Court's decision in Axenics, Inc. v. Turner Constr. Co., 164 N.H. 659 (2013). Once again, the court discusses each argument in turn.

### 1. Disputed Amounts

The defendants contend that Fraser improperly included amounts for the labor inefficiency and outstanding change order requests as part of its lien. The defendants claim that Fraser did not receive prior written approval from IPS to perform the work resulting in these amounts, as required by section 2.18 of the subcontract. The defendants contend that, absent written authorization or actual knowledge, claims for additional or extra work do not fall within the scope of the mechanics lien statute.

The court is not persuaded by this argument. It is well-established under New Hampshire law that, under certain circumstances, "the written terms of a contract may be waived orally or by implication." D.M. Holden, Inc. v. Contractor's Crane Serv., Inc., 121 N.H. 831, 835 (1981) (citation omitted). To this end, the New Hampshire Supreme Court has upheld a finding that an advanced-approval requirement in a construction contract was waived when that requirement was "disregarded by the parties." Id. Here, Fraser has provided evidence, disputed by the defendants, that neither Fraser nor IPS adhered to the requirements of section 2.18 during the course of Fraser's work

on the project.  While the arbitrator will ultimately resolve
this dispute, Fraser has a non-frivolous argument that the
parties' subsequent conduct eliminated or limited section 2.18's
enforceability.  The court therefore declines to reduce the lien
based on a strict construction of section 2.18.

    2.    Amount Owed by Lonza to IPS

    The defendants next argue that Fraser's lien must be
limited to the amount Lonza owed IPS under the prime contract at
the time Fraser provided notice of its intent to lien.  The
defendants cite Russell v. Woodbury, 135 N.H. 432 (1992), and
RSA 447:6 in support of this argument.  The defendants contend
that Lonza owed IPS $1,866,951.87 under the prime contract on
the date Fraser provided its notice of lien. The defendants
contend that Fraser's lien should be limited to this amount.

    Fraser responds with two arguments.  First, Fraser contends
that the prime contract is a "cost of work" contract that did
not limit the total amount Lonza may be required to pay IPS for
work on the project.  Alternatively, Fraser contends that IPS
has failed to adequately demonstrate that Lonza only owed
$1,866,951.87 under the prime contract as of the date Fraser
provided its lien notice.  Either way, according to Fraser, the
lien amount should not be reduced.

    Fraser's first argument is persuasive.  RSA 447:6 states
that if a subcontractor provides notice of its intent to lien

after performing labor, its mechanics lien "shall be valid to the extent of the amount then due or that may become due to the contractor . . . ." The New Hampshire Supreme Court has interpreted this language to limit recovery "to those sums in fact due and owing to the general or principal contractor at the time of notice plus any sums which actually become due to the general or principal contractor after notice is given." Russell, 135 N.H. at 435. Here, Fraser has demonstrated that IPS has not paid it for work it performed and materials it furnished as part of the project. Should Fraser prevail on the merits of its underlying claims, those amounts are actually due. Additionally, Fraser has pointed to language in the prime contract suggesting that Lonza must pay IPS for "the cost of trade labor including the indirect costs, overhead and profit for all [s]ubcontractors and equipment necessary for construction." See Prime Contract § 17.16; see also id. § 10.6.1 (requiring Lonza to pay IPS for work performed by subcontractors under their subcontracts). Given this language, the court cannot conclude that $1,866,961.87 is the total actually due to IPS under the prime contract. The court therefore declines to limit the lien to that amount.

3.    Unpaid Retainage

The defendants contend that Fraser's lien claim improperly

includes unpaid retainage.[11]  The defendants contend that Fraser's inclusion of retainage is premature, as Fraser has not yet met certain conditions precedent to be entitled to that amount.  In response, Fraser argues, among other things, that it properly included retainage in its lien because its lien arose when it performed the work.

The court agrees with Fraser.  Under New Hampshire law, the "creation of a lien does not depend upon the owner's nonpayment; rather, the contractor 'creates' its own lien by performing the work or furnishing the materials."  Daniel, 150 N.H. at 583.  There does not appear to be any meaningful dispute here that IPS is withholding retainage for work Fraser actually performed or materials Fraser actually furnished as part of the project.  This amount was therefore properly included in the lien.

    4.  Axenics

At the hearing, Lonza argued that Fraser's lien must be reduced based on the New Hampshire Supreme Court's holding in Axenics.  Lonza elaborates upon this argument in its post-hearing memorandum.  In pertinent part, Lonza contends that the majority of Fraser's claim is based upon equitable adjustments

---

[11] IPS is withholding $627,187.47 in unpaid retainage.  Doc. no. 43 ¶ 21.  This amount includes the $593,155.13 in outstanding subcontract balance Fraser includes in its lien and $34,032.46 in credits Fraser has agreed to provide IPS.  Doc. no. 12-4 at 2.

or quasi-contractual remedies.  Citing Axenics, Lonza contends
that Fraser may not avail itself of these remedies because clear
contractual provisions control the dispute.

Lonza's argument is unavailing for at least three reasons.
First, another judge in this district considered and rejected
the same argument in Osgood v. Kent.  See 2011 WL 6740411, at
*3.  Lonza makes no attempt to distinguish Osgood, and the court
finds the reasoning in that case to be persuasive.  The court
therefore declines to deviate from Osgood here.

Next, as noted in Osgood, the New Hampshire Supreme Court
has previously reversed the discharge of a mechanics lien in a
case brought "under theories of breach of contract, quantum
meruit and unjust enrichment . . . ."  Alex Builders & Sons,
Inc. v. Danley, 161 N.H. 19, 21 (2010).  No portion of that
decision suggests that a party cannot secure a mechanics lien
for claims brought under a quasi-contract theory, at least so
long as there was an underlying contract between the parties.
This, too, militates against Lonza's reading of Axenics.

Finally, and perhaps most fundamentally, Lonza in essence
raises a substantive defense to Fraser's underlying claims.  It
is up to the arbitrator, not this court, to determine the
relative merits of Fraser's claims and the defendants' defenses
to those claims.  It is beyond the scope of the present review
to delve into those waters now.

The court therefore declines to reduce the lien simply because Fraser asserts claims under a quasi-contract theory.

## IV.   Conclusion

For the reasons set forth above, the court concludes that the defendants have not demonstrated that Fraser's lien should be discharged or reduced.  The court therefore overrules the defendants' objections and grants Fraser's motion to perfect the lien in the amount of $4,917,122.02.

SO ORDERED.

Andrea K. Johnstone
United States Magistrate Judge

March 27, 2018

cc:   Ronald D. Ciotti. Esq.
      Seth Michael Pasakarnis, Esq.
      Rene David Quinlan, Esq.
      Shawn R. Farrell, Esq.
      Peter G. Callaghan, Esq.
      Christopher T. Hilson, Esq.